### Joseph W. O'Brien, Appellee, v. Chicago Junction Railway Company, Appellant.

### Gen. No. 16,488.

1. MASTER AND SERVANT—*condition of railroad yards.* Where plaintiff, a rear switchman, had been told by the conductor that a string of freight cars would be set on a switch track number 9, and while plaintiff, in crossing over to said track, was opening a closed coupler on a track number 13, the conductor had the cars switched on track 13, and plaintiff, in jumping to escape being struck, had his foot caught by a large clinker and in consequence lost his right leg, the yard having been ballasted by rough slag and similar large lumps being scattered on the tracks, the questions of contributory negligence and assumed risk were for the jury, and verdict for $10,000 affirmed.

2. MASTER AND SERVANT—*negligence in ballast of railroad yards.* Where a switching yard is ballasted with rough lumps of slag,

some a foot or more across and projecting above the ties, negligence is manifest.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the March term, 1910. Affirmed. Opinion filed January 27, 1913. Rehearing denied February 10, 1913.

WINSTON, PAYNE, STRAWN & SHAW, for appellant; JOHN D. BLACK and JOHN C. SLADE, of counsel.

JAMES C. McSHANE, for appellee.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

The plaintiff, here the appellee, was employed by the defendant, here the appellant, at the time of his injury, as a switchman in the switch yards at Stickney, Illinois. In the northwest part of the said yards a lead track extended northwesterly and southeasterly. From this lead extending east was a series of twenty-five switch tracks parallel to each other and numbered 1 to 25 from north to south. Tracks numbered 1 to 8 inclusive were receiving tracks and 9 to 25 inclusive delivery tracks, each of said tracks holding from 60 to 100 cars. The cars were taken from the receiving tracks out onto the lead, in what were called "cuts" of about fifteen cars each, and then placed from the lead onto the proper delivery tracks. The switching crew consisted of the engineer, fireman, conductor (or foreman), head and rear switchman. The plaintiff was the rear switchman, with many years' experience, but the night in question, January 2nd, was the third time he had worked at the said yards. The other two occasions being during the days just before the accident. The crew left 47th street, Chicago, about ten o'clock in the evening and went to the said yards, about ten miles, reaching there between 10:30 and 11:00 o'clock. It was a rainy night, and in switching the last cut,

about six o'clock in the morning, the accident occurred. A car had been set on track 17, leaving only three cars attached to the engine, which were Wabash cars, to go on track 9, the receiving track for Wabash cars. The conductor had told plaintiff that these three cars would be set on track 9 and then they would be through. After setting the car on track 17 the engine pulled out on the lead track with the three Wabash cars, and O'Brien, being the rear or field man, started to cross the yard from track 17 to track 9, where the three Wabash cars were to be set. On crossing track 13 he found an opening between the cars standing on said track 13, and observing the coupler was closed attempted to open same, and while so engaged, supposing that the switching crew was about to put the Wabash cars on track 9, the Wabash track, the conductor changed his mind and set the Wabash cars in on track 13, the C. & E. I. receiving track, without notice or warning to the plaintiff. In a statement made by the conductor and introduced in evidence, he says: "I did not tell Switchman O'Brien that I was going to set these three Wabash cars in on No. 13 track, but decided to do this after I had got through with the switch of one car in on No. 17 track, and then decided, instead of holding on to these three Wabash cars, that I would set them away on No. 13 and go in and finish switching out the remainder of string on No. 9, after which it was my intention to get these three Wabash cars off of No. 13 and put them back on No. 9 track, for which track I had chalked them for. After the movement in on No. 17 track of the one car, the fourth car, I saw Switchman O'Brien going down across yard. I saw him by the lantern he was carrying. I did not at this time personally know where he was going, but took it for granted that he was headed for the other end of No. 9. At the time of this accident it was just breaking day, it was misty. We were all carrying lanterns and all signals were given by lantern." It was the duty of switchmen when they

found cars were uncoupled and both knuckles closed to open at least one of them so that upon the impact they could couple together. It was in the performance of this duty that plaintiff was injured as described by him as follows: ''I went over to the coupler and got hold of the chain, and took my lead pencil to see if it was caught, to try to work the chain loose so that the knuckle would open. I heard a crash of some cars striking together, and I naturally jumped. I jumped toward the north and east. A great big cinder caught my foot, and I was thrown between the rails. I seen the cars coming and I rolled as fast as I could to try to get out from between them. My whole body was inside the rails when I was thrown. I rolled over the rail to the north. All except my right leg. The cars I was standing at did not move at the first crash. When I fell down I seen the cars making a jump for me, just as I fell. I should judge the car went pretty near a car-length; a half a car-length or a little over, towards the east. It ran over me right above the knee of my right leg.'' The plaintiff suffered two amputations of his leg, leaving about five or six inches of the bone below the hip. The description of the yard in the language of counsel for defendant is as follows: ''The yard was ballasted with rolling mill cinders. Several witnesses called it slag ballast. This ballast covered the entire yard, except that along the lead and for a distance of three or four car lengths away from it, ordinary cinder ballast had been used. The slag ballast was much rougher, and, according to all of plaintiff's witnesses, there were lumps of slag scattered throughout the yard, many several inches square and some even a foot or more across. There was no particular place where these lumps were found. Besides this, it was not surfaced up between the ties. In some places the ballast projected above the tops of the ties, and in others it did not come up to within several inches of the tops. This was the way the yard was made. There were no foreign substances on or near the tracks.''

The case went to the jury on two counts. The first of said counts alleging negligence of the defendant in that it set the said Wabash cars in on track 13 under the circumstances, detailing them, without warning or notice to the plaintiff thereof; and the second of said counts averring the negligence of the defendant in permitting track 13 to be and remain in an unsafe and improper condition, in that the spaces between the ties of said track were unfilled and there were large clinkers and other obstructions upon and near the said track. The jury found defendant guilty and assessed the plaintiff's damages at the sum of ten thousand dollars, and the court entered judgment therefor.

The defendant insists that it was guilty of no negligence; that the plaintiff was guilty of contributory negligence; that the plaintiff assumed the risk of the conditions existing in the yard and the method of doing the work; that the court erred in denying the defendant's motion to exclude the evidence on the ground of variance; that the court erred in ruling on certain instructions and plaintiff's counsel made improper remarks in his argument to the jury.

After a careful study of the evidence and the photographs of the yards in evidence, we are of the opinion that the only question under the first count open to discussion is the negligence of the defendant; and as to the second count, the assumption of the risk by the plaintiff. The negligence averred and proven under the second count is so manifest that it might be considered under all the circumstances almost wilful. The case was bitterly contested and the learned counsel for both parties have here filed interesting and exhaustive arguments in support of their respective contentions. Upon the two controverted questions that we have indicated, we think there is evidence tending to support the plaintiff's averments; and an analysis of the evidence and the arguments in support of and also in opposition thereto would subserve no good purpose. Suffice it to say that both were questions of fact for

the jury, and under all the evidence we are not disposed to disturb the verdict of the jury thereon.

It seems to us that the other objections urged as reversible error, the variance, the instructions and remarks of counsel in argument, are all untenable and require no discussion.

The judgment is affirmed.

*Affirmed.*